J-S16018-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: E.F., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| APPEAL OF: E.F., FATHER | : | |
| | : | |
| | : | No. 243 EDA 2023 |

Appeal from the Order Entered December 21, 2022
In the Court of Common Pleas of Philadelphia County
Juvenile Division at CP-51-DP-0001045-2020

| | | |
|---|---|---|
| IN THE INTEREST OF: E.R.U.F., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| APPEAL OF: E.F., FATHER | : | |
| | : | |
| | : | No. 244 EDA 2023 |

Appeal from the Decree Entered December 21, 2022
In the Court of Common Pleas of Philadelphia County
Juvenile Division at CP-51-AP-0000047-2022

BEFORE:  DUBOW, J., MURRAY, J., and McCAFFERY, J.

MEMORANDUM BY MURRAY, J.: **FILED MAY 31, 2023**

E.F. (Father) appeals from the decree terminating his parental rights to E.R.U.F. (Child), and the order changing Child's permanency goal to adoption.[1] We affirm.

---

[1] This Court consolidated the appeals on March 28, 2023.

Child was born in October 2012 to Father and N.C., a/k/a, N.S. (Mother).[2] According to Father, Child lived with both parents until 2016, when Mother and Father separated, and Father moved from the home. N.T., 12/21/22, at 66-67. After 2016, Father saw Child on weekends, but had a "poor relationship" with Mother, and Father's relationship with Child from 2016 to 2020 was "on and off." *Id.* at 68, 83. Father stated that Mother "has mental problems" and "would use [Child] as a pawn." *Id.* In addition, Father has been incarcerated "at different periods" throughout Child's life. Father's Brief at 6. According to Father, he was incarcerated from August 2019 - May 2020; June 2021 - March 2022; and from July 2022 through the December 21, 2022 termination hearing. N.T., 12/21/22, at 64-65.

Child came to the attention of the Philadelphia Department of Human Services (DHS) on August 28, 2018, when DHS received a report that Mother had physically abused Child's one-year-old sibling. At that time, Child was "in the care of the maternal grandmother (Grandmother)."[3] *Interest of E.F.*, 284 A.3d 956 (Pa. Super. 2022) (unpublished memorandum at 2). The younger sibling was adjudicated dependent and placed with Grandmother, "with whom Child lived." *Id.* at 2.

---

[2] The trial court also terminated Mother's parental rights. She has appealed the termination at 2851 EDA 2022 and the goal change at 242 EDA 2023.

[3] Grandmother had custody of Child "per a custody order obtained from the Domestic Relations Court." DHS Brief at 4.

In June 2020, Mother gave birth to another child. Mother had regained custody of Child from Grandmother, and Mother, Child, and the newborn moved to a shelter. *Id.* At that time, Father was "not involved in the care of" Child. Trial Court Opinion, 12/20/22, at 12.[4]

In September 2020, Child came into the care of DHS as a result of "Mother's incidents with her other children and her inability to care for" Child. N.T., 12/21/22, at 29. On October 2, 2020, DHS filed an "urgent dependency petition" regarding Child. *Int. of E.F.*, *supra* at 3.

On January 6, 2021, the trial court adjudicated Child dependent, transferred legal custody to DHS, and placed Child in a confidential foster care location. *Id.* Between January 2021 and January 2022, Child was placed in 11 different foster homes. *Id.* at 4.

On January 19, 2022, DHS petitioned to terminate Father's parental rights and change Child's permanency goal to adoption. The trial court held a hearing on December 21, 2022. Child was represented by guardian *ad litem*, Andre Martino, Esquire, and legal counsel, Emily Cherniak, Esquire.[5] DHS

---

[4] The trial court wrote the opinion in response to Mother's appeal. In correspondence dated February 16, 2023, the First Judicial District Director of Court Listings advised this Court that the trial court judge had retired and "there is no Opinion forthcoming." *See* Father's Brief at 40 (Appendix).

[5] A child's legal and best interests are distinct. Representing a child's legal interests "denotes that an attorney is to express the child's wishes to the court regardless of whether the attorney agrees with the child's recommendation," while a guardian *ad litem* discerns the child's best interests; in each case,
*(Footnote Continued Next Page)*

presented testimony from case manager, Tamika Palmer. Father testified in opposition to DHS's request to terminate his parental rights and change Child's permanency goal to adoption.

Ms. Palmer testified to becoming involved with the family on February 9, 2022, while Father was incarcerated. N.T., 12/21/22, at 10. When Father was released from prison in April 2022, Ms. Palmer called him to "review his single case plan, inform him of an upcoming meeting, and also discuss visits." *Id.* at 11. The case plan required Father to make "his whereabouts known, complete … parenting [classes], engage in supervised visits with [Child], and obtain safe and suitable housing." *Id.* at 12. In addition, Father was referred for a dual diagnosis assessment and screening for mental health and substance abuse. *Id.*

According to Ms. Palmer, DHS arranged for Father's visitation with Child, but Father "did not make himself available, [and] he never showed" for the one visit he confirmed. *Id.* at 14-15. Ms. Palmer attempted to reach Father by phone; she called weekly and left messages when Father did not answer. *Id.* at 17-18. Ms. Palmer learned that Father was incarcerated in September or October of 2022. *Id.* at 19. When counsel for DHS asked which case plan goals Father achieved, Ms. Palmer replied, "None." *Id.* at 21. She stated that Father "made no progress." *Id.*

---

these interests are ultimately determined by the orphans' court. *In re P.G.F*, 247 A.3d 955, 964 (Pa. 2021) (citation omitted).

Ms. Palmer testified that Father has not met any of Child's needs. *Id.* at 23. She stated that Father is "not able to meet [Child's] needs mentally and emotionally." *Id.* at 27. Ms. Palmer opined that Child could not be safely returned to Father "today … or in the near future." *Id.* at 25.

Ms. Palmer further testified that Child was doing well in placement. *Id.* at 9. Child has been in her current placement since December 17, 2021.[6] *Id.* at 31. Ms. Palmer stated that Child does not mention Father. *Id.* at 22. When Ms. Palmer has asked Child about Father, Child "says she knows her father and is aware of him[, b]ut she doesn't say anything outside of that," and has not requested visits or communication with Father. *Id.* Ms. Palmer testified that Child "looks to her current foster parent for all of her basic needs and wants." *Id.* at 23. Ms. Palmer opined that termination would not "have a harmful impact" on Child. *Id.* at 23. Ms. Palmer also opined that adoption is in Child's best interest. *Id.* at 25.

Father was incarcerated at the time of the termination hearing.[7] Father testified that he lived with Mother and Child for the first four years of Child's life, from 2012 – 2016, and was involved in parenting and financially supporting Child. *Id.* at 66-67. In 2016, Father and Mother separated, and

---

[6] Father's counsel noted that Child's placement was confidential due to "issues regarding M[other], her behavior, her threat, her risk of a threat. Nothing to [do with] Father." N.T., 12/21/22, at 31.

[7] Referencing Father's criminal docket, the trial court observed that Father was arrested July 30, 2022 for charges related to delivery and possession of controlled substances. N.T., 12/21/22, at 51; Exhibit D-34.

Father began living with his sister. *Id.* at 73, 83. Father described his relationship with Child from 2016 — 2020 as "on and off," but stated that he saw Child on weekends, and continued to "provide whatever [Mother] told me [Child] needed." *Id.* at 68, 83. Father also stated that Mother "has mental problems" and "would use [Child] as a pawn." *Id.* at 83. He stated he did not file for custody of Child "because her grandmother had her at first." *Id.* at 84.

Father testified that he was incarcerated August 2019 - May 2020; June 2021 - March 2022; and from July 2022 through the December 21, 2022 termination hearing. *Id.* at 64-65. Father stated that he was scheduled to go to trial on December 28, 2022. *Id.* at 75. He was also "being held on a separate detainer for probation violations because of [his most recent] arrest." *Id.* at 76.

Father testified that he had no contact with DHS or their service providers until after he was released from prison in March 2022. *Id.* at 71. When Father was first incarcerated, he did not know about DHS's involvement with Child; later, Father did not have contact information for DHS and did not know that he could try to arrange visits with Child at the prison. *Id.* at 79-80. Father stated he "wasn't aware of" his case plan objectives and he did not believe he needed parenting classes. *Id.* at 72. When he's not incarcerated, Father lives with his sister in a three bedroom apartment. *Id.* at 73-76, 85. He also has employment at his brother's auto body shop and earns sufficient income to support Child. *Id.* at 77.

Father believes Child loves him and has a bond with him. *Id.* at 78, 81. Father disagreed with Ms. Palmer's testimony that Child would not be harmed by termination of Father's rights. *Id.* at 80-81. Father stated that he loves Child and believes he can meet her needs. *Id.* at 83. Father last spoke with Child during a brief telephone conversation facilitated by Ms. Palmer in 2022. *Id.* at 16-17, 87-88. Father testified that he last saw Child in 2020, "on her 8th birthday." *Id.* at 87.

Attorney Cherniak, who represented Child's legal interests, stated that she "spoke with [Child]. She did not mention her father when I spoke with her." *Id.* at 58.

Following the hearing, the trial court entered a decree terminating Father's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8) and (b). Decree, 12/21/22. The trial court also entered an order changing Child's permanency goal to adoption. Order, 12/21/22. Father timely appealed.

Father presents the following issues for review:

1. Whether the trial court committed error by involuntarily terminating [Father's] parental rights where such determination was not supported by clear and convincing evidence establishing grounds for termination under the Adoption Act, 23 Pa. C.S.A. §§2511 (a)(1), (a)(2), (a)(5) and (a)(8), and without giving primary consideration to the developmental, physical, and emotional needs and welfare of the child as required by the Adoption Act, 23 Pa. C.S.A. §2511(b)?

> 2. Whether the trial court committed error by changing [C]hild[]'s permanency goal from reunification with the parent(s) to adoption?

Father's Brief at 5.

Father argues the trial court erred in finding clear and convincing evidence to support termination of his parental rights.[8] DHS has the burden to prove by clear and convincing evidence that its asserted grounds for termination are valid. *In re R.N.J.*, 985 A.2d 273, 276 (Pa. Super. 2009). "[T]he standard of clear and convincing evidence is defined as testimony that is so clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *Id.*

As an appellate court, we apply an abuse of discretion standard. *In re Adoption of S.P.*, 47 A.3d 817, 826 (Pa. 2012).

> [O]ur standard of review requires [us to] accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. As has been often stated, an abuse of discretion does not result merely because the reviewing court might have reached a different conclusion. Instead, a decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will.
>
> As [the Supreme Court] discussed in *In re: R.J.T.*, [9 A.3d 1179, 1190 (Pa. 2010)], there are clear reasons for applying an abuse of discretion standard of review in these cases. [U]nlike trial

---

[8] DHS and the Guardian *Ad Litem* argue that termination and the goal change were proper. *See* DHS's Brief at 13-27; Guardian *Ad Litem*'s Brief at 16-24.

courts, appellate courts are not equipped to make the fact-specific determinations on a cold record, where the trial judges are observing the parties during the relevant hearing and often presiding over numerous other hearings regarding the child and parents. ***R.J.T.***, 9 A.3d at 1190. Therefore, even where the facts could support an opposite result, as is often the case in dependency and termination cases, an appellate court must resist the urge to second guess the trial court and impose its own credibility determinations and judgment; instead, we must defer to the trial judges so long as the factual findings are supported by the record and the court's legal conclusions are not the result of an error of law or an abuse of discretion.

***In re Adoption of S.P.***, 47 A.3d 817, 826-27 (Pa. 2012) (some citations omitted).

## § 2511. Grounds for involuntary termination

Under 23 Pa.C.S.A. § 2511, "the court must engage in a bifurcated process prior to terminating parental rights." ***In re L.M.***, 923 A.2d 505, 511 (Pa. Super. 2007). Initially, the focus is on the conduct of the parent pursuant to § 2511(a). ***Id.***

### Section 2511(a)

This Court need only agree "as to any one subsection in order to affirm the termination of parental rights." ***In re A.S.***, 11 A.3d 473, 478 (Pa. Super. 2010). Here, we address the subsection which provides for termination when a parent's

repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

- 9 -

23 Pa.C.S.A. § 2511(a)(2).

Section 2511(a)(2) "emphasizes the child's present and future need for essential parental care, control or subsistence necessary for his physical or mental well-being." *In re E.A.P.*, 944 A.2d 79, 82 (Pa. Super. 2008) (citation and quotation marks omitted). Grounds for termination under subsection (a)(2) are not limited to affirmative misconduct. *Id.* "Where the parent does not exercise reasonable firmness in declining to yield to obstacles, h[is parental] rights may be forfeited." *Id.* at 83. Grounds for termination may include acts of refusal as well as incapacity to perform parental duties. *In re S.C.*, 247 A.3d 1097, 1104 (Pa. Super. 2021). A parent is required to make diligent efforts toward the reasonably prompt assumption of full parental responsibilities. *In re Adoption of M.A.B.*, 166 A.3d 434, 443 (Pa. Super. 2017).

In challenging termination under Section 2511(a)(2), Father asserts:

By his association with [M]other, DHS … assumed similar issues existed as to [Father], like negligen[ce], parenting inability, disinterest, substance abuse, transience and mental health disorders. In fact, [F]ather had been involved in [Child]'s life since her birth and had been her primary custodian and caregiver prior to his incarceration. The information that DHS … had regarding [F]ather and his address, contact information and whereabouts were provided to them by [M]other, who was belligerent and oppositional. [Father] was only once afforded the opportunity to be brought from prison and attend [C]hild's court proceedings, which was the date of the termination/goal change hearing. Father appeared and testified that he loved his daughter, cared for her, had a bond with her, and wanted to be reunified with her upon his release.

Father's Brief at 23.

- 10 -

Father contends "DHS did not show with clear and convincing evidence … that [Father] has [evidenced a] repeated and continued incapacity to properly parent his daughter." *Id.* at 31. We are unpersuaded by Father's argument.

At the time of the termination hearing, Child had been in DHS's care for approximately two years. According to Father, he was incarcerated for 16 months of the two years (June 2021 to March 2022, and July 2022 through the December 21, 2022 termination hearing). N.T., 12/21/22, at 64-65. Father stated that he first learned about Child being in DHS's care in May 2021, "as soon as I came home [from jail] … the first week I was out." *Id.* at 69. Father testified that DHS did not communicate with him when he was incarcerated or when he was living with his sister. *Id.* at 69-71. Father stated that after he learned about DHS's involvement, he "wound up getting locked back up, so I didn't [do anything]. I couldn't do anything until I was recently out." *Id.* at 70.

We reiterate that grounds for termination due to parental incapacity are not limited to affirmative misconduct. *In re T.L.C.*, 199 A.3d 1270, 1278 (Pa. Super. 2018). This Court recently recognized "a parent's fundamental duty to protect one's child, a duty that necessarily includes knowing the whereabouts and living arrangements of his or her minor child." *Int. of R.C.-G.*, --- A.3d ---2023 PA Super 55 (Mar. 31, 2023) (Opinion at 6 n.24).

With respect to incarcerated parents, our Supreme Court has held that "incarceration, while not a litmus test for termination, can be determinative of the question of whether a parent is incapable of providing essential parental care, control, or subsistence." *In re Adoption of S.P.*, 616 Pa. 309, 47 A.3d 817, 830 (2012) (citation and internal quotation marks omitted). Incarceration alone is not sufficient to support termination under any subsection, but "incarceration will certainly impact a parent's capability of performing parental duties, and **may** render a parent incapable of performing parental duties under subsection (a)(2)." *In re E.A.P.*, 944 A.2d 79, 82–83 (Pa. Super. 2008) (emphasis in original).

"Each case of an incarcerated parent facing termination must be analyzed on its own facts, keeping in mind ... that the child's need for consistent parental care and stability cannot be put aside or put on hold[.]" *Id*. at 84. "Parental rights are not preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide the child with his or her physical and emotional needs." *B.N.M.*, 856 A.2d at 855 (citation omitted). Rather, "[a] parent must utilize all available resources to preserve the parental relationship, and must exercise reasonable firmness in resisting obstacles placed in the path of maintaining the parent-child relationship." *Id.* (citations omitted).

*Interest of K.M.W.*, 238 A.3d 465, 474 (Pa. Super. 2020) (*en banc*).

Here, the trial court found Father's continued incapacity to parent has caused Child to be without parental care, and Father's incapacity could not be remedied. The court stated:

… Father did nothing to rekindle th[e] relationship [with Child]. He did nothing to find out where [C]hild was, although he had more than reasonable belief … that the child was in DHS's care. But during that time, he did nothing to determine where [C]hild was. [Father made n]o effort to keep the parent/child relationship alive, and essentially walked away from [C]hild.

- 12 -

And despite the many opportunities he had to connect with DHS, the agency, [and] specific case workers[,] he did nothing. And he was in prison on a number of those occasions. He was in and out of prison. But when he came out of prison, he did nothing to find [C]hild, although he had reasonable beliefs that the child was in DHS's care.

And he stands before the [c]ourt now still in prison. He has a trial date next week on the 28th. … [Father h]as no reasonable prospect of being able to care for this child in the future. The child has maybe a part[ial] understanding of who her father is, but has no parental relationship, and hasn't had one for at least two years and possibly going back to … 2016, when [Father] separated from Mother. So for [] six years[, Father] … has been a fleeting presence in [Child's] life.

And he's done nothing to remedy it. Specifically, the goals that were set for him were never complied with. But more importantly, as we sit here today, he is neither ready, willing, or able to care for this child. And his speculation about what he's going to do when he gets out of jail is just that.

It's speculation. …

[Father] doesn't even know when he's going to get out of jail, let alone when he's going to be in a position to care for this child. And the child is in a placement where she is receiving care. …

She's a needy child because of her special circumstances. And [Father] presents no ability to care for a child with these needs. So looking at the record as a whole … Father has failed to remedy the issues that brought the child into care. …

… [Father has been] absen[t] in this child's life. And we want better for our children.

N.T., 12/21/22, at 90-92.

The above findings are supported by the record and legally sound. *In re Adoption of S.P.*, 47 A.3d at 826-27 (stating appellate courts must defer to trial judges when factual findings are supported by the record and the trial

court's legal conclusions are not the result of error); ***In re R.J.S.***, 901 A.2d 502, 513 (Pa. Super. 2006) ("a child's life cannot be held in abeyance while a parent attempts to … assume parenting responsibilities."). Thus, the trial court did not abuse its discretion in concluding that Father's continued incapacity to parent has caused Child to be without essential parental care, and the conditions and causes of the incapacity will not be remedied.

Section 2511(b)

Father also argues the trial court erred in terminating his parental rights under Section 2511(b), which requires the court "give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S.A. § 2511(b). Father claims DHS did not present clear and convincing evidence as to "whether termination … would best serve the developmental, physical and emotional needs and welfare" of Child. Father's Brief at 34.

"Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child." ***In re L.M.***, 923 A.2d 505, 511 (Pa. Super. 2007). When the trial court considers a child's needs and welfare, the "extent of any [parental] bond analysis … necessarily depends on the circumstances of the particular case." ***In re K.Z.S.***, 946 A.2d 753, 763 (Pa. 2008). This Court has instructed:

> [I]n addition to a bond examination, **the trial court can equally emphasize the safety needs of the child**, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. Additionally, … the trial court should consider the importance of continuity of relationships and whether any existing parent-child bond can be severed without detrimental effects on the child.

*In re A.S.*, 11 A.3d at 483 (citations omitted, emphasis added).

Father conceded he was absent from Child's life in recent years, including periods when he was not incarcerated. Child was 10 years old at the time of the termination hearing, and Father stated he last saw Child "on her 8th birthday." N.T., 12/21/22, at 87. Ms. Palmer testified that Child was doing well in placement. *Id.* at 9, 31. Ms. Palmer stated that Child "looks to her current foster parent for all of her basic needs and wants." *Id.* at 23. Ms. Palmer also stated that Child "knows [F]ather and is aware of him[, b]ut she doesn't say anything outside of that," and has not requested contact with Father. *Id.* at 22. Ms. Palmer testified that termination would not "have a harmful impact" on Child. *Id.* at 23. Ms. Palmer opined that adoption is in Child's best interest. *Id.* at 25.

Based on this evidence, the trial court did not abuse its discretion in considering Child's best interests and terminating Father's parental rights under Section 2511(b).

### Goal Change

Father next argues, without citing any legal authority, that the trial court erred in changing Child's permanency goal from reunification to adoption.

Father's Brief at 35-36. Father asserts the order changing Child's permanency goal to adoption "was not supported by clear and convincing evidence … and is not in [C]hild's best interests." *Id.* at 36. This issue is moot because we have concluded the trial court did not abuse its discretion in terminating Father's parental rights. *See In re Adoption of A.H.*, 247 A.3d 439, 446 (Pa. Super. 2021) ("[T]he effect of our decision to affirm the orphans' court's termination decree necessarily renders moot the dependency court's decision to change Child's goal to adoption.") (citing *Interest of D.R.–W.*, 227 A.3d 905, 917 (Pa. Super. 2020) ("An issue before a court is moot if in ruling upon the issue the court cannot enter an order that has any legal force of effect.") (citation omitted)).

For the above reasons, we affirm the decree terminating Father's parental rights and the order changing Child's permanency goal to adoption.

Decree and order affirmed.

Judge McCaffery joins the memorandum.

Judge Dubow did not participate in the consideration or decision of this case.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 5/31/2023

- 16 -